1

2

3

4

5              UNITED STATES DISTRICT COURT

6            NORTHERN DISTRICT OF CALIFORNIA

7

8    DANIEL J. KANE, *et al.*,                    No. C-12-5437 EMC

9              Plaintiffs,

10        v.                                       **ORDER GRANTING IN PART AND
                                                   DENYING IN PART PLAINTIFFS'
                                                   MOTION TO DISMISS AMENDED**
11   KENNETH W. DELONG, *et al.*,                  **COUNTERCLAIM AND TO STRIKE**

12             Defendants.                         **(Docket No. 23)**
     _____/

13

14

15                      I.    **INTRODUCTION**

16        This case stems from a former collaborative effort to develop software to be used for

17   Frequency-Resolved Optical Gating ("FROG"), a method for measuring ultrashort laser pulses,

18   which effort has since turned south.  Plaintiffs Daniel Kane and Mesa Photonics, LLC ("Mesa")

19   bring a sole cause of action against Defendants Kenneth DeLong and Femtosoft Technologies

20   ("Femtosoft") for infringement of U.S. Patent No. 7,130,052 ("the '052 patent").  *See* Compl.,

21   Docket No. 1, ¶¶ 20-30.  In return, Defendants[1] assert counterclaims for declaratory judgment of (1)

22   invalidity, (2) non-infringement, (3) unenforceability due to inequitable conduct, (4)

23   unenforceability for equitable estoppel, and (5) unenforceability for laches.  First Am. Answer &

24   Counterclaims ("Countercl."), Docket No. 20, ¶¶ 20-94.  In addition, Defendants assert separate

25   counterclaims for (6) breach of contract and (7) violation of California Business & Professions Code

26

27        [1] The parties' briefs and Defendants' counterclaim also refer to Defendants as
     "Counterclaimants" and to Plaintiffs as "Counterclaim Defendants."  For ease of reference, this
28   memo simply labels the parties "Plaintiffs" and "Defendants."

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    section 17200 and the following (Defendants' "UCL claim").  Countercl. ¶¶ 95-105.  Plaintiffs now

2    move to dismiss Defendants' counterclaims for declaratory judgment of unenforceability for

3    equitable estoppel, declaratory judgment of unenforceability for laches, breach of contract, and

4    violation of section 17200.  *See* Pls.' Mot. to Dismiss Am. Countercl. ("Pls.' Mot."), Docket No. 23,

5    at 2-9.  In addition, Plaintiffs move to strike Defendants' reservation of affirmative defenses and

6    their prayer for relief as it relates to claims for equitable estoppel, laches, breach of contract, and

7    section 17200.  *Id.* at 10.

8          For the reasons stated herein and as discussed at the hearing on this matter, the Court

9    **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to dismiss and to strike.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

11   A.    Initial Work with FROG

12         This case dates back to 1992, when Defendant DeLong began working at Sandia National

13   Laboratories ("Sandia") as a postdoctoral fellow for Rick Trebino.  Countercl. ¶ 50.  In this capacity,

14   DeLong worked at implementing and refining FROG algorithms.  *Id.*  FROG measures ultrashort

15   laser pulses by using a variety of ordinary laboratory apparatuses to produce a two-dimensional

16   image called a FROG trace, which is analyzed by FROG algorithms to determine the intensity and

17   phase of the electric field of a laser pulse.  *Id.*  This process is repeated or iterated until the accuracy

18   of the estimate is satisfactory, typically determined by calculation of the "FROG error," a numerical

19   measurement of the difference between the measured and reconstructed FROG traces, and/or by

20   visual comparison of the measured and reconstructed FROG traces.  *Id.*

21         DeLong spent approximately three years at Sandia, during which time he published articles

22   and papers regarding FROG.  *Id.* ¶ 50.  In the same time frame, Plaintiff Kane was also working

23   with Trebino on FROG implementations, in which capacity he even co-published an article with

24   DeLong and Trebino regarding FROG.  *Id.* ¶ 51.

25   B.    Commercial Development

26         In 1996, DeLong started Femtosoft, which developed a commercial implementation of the

27   FROG algorithm, Femtosoft FROG, first sold on January 17, 1997.  *Id.* ¶ 52.  Kane himself

28

United States District Court

For the Northern District of California

1  purchased a copy of Femtosoft FROG on or about June 7, 1997 and published an article in 1999

2  disclosing his use of the Femtosoft FROG program.  *Id.* ¶¶ 52-53.

3      In or around 2001, Trebino developed a new real-time FROG implementation called

4  GRENOUILLE and formed Swamp Optics, LLC to commercialize it.  *Id.* ¶ 54.  Trebino asked

5  DeLong to adapt Femtosoft FROG to work with GRENOUILLE, but DeLong declined due to

6  concern that the market was not large enough to make the effort worth the potential reward.  *Id.*

7  Trebino and Swamp Optics thereafter worked with Kane, who developed VideoFROG to run on

8  GRENOUILLE.  *Id.*  Swamp Optics purchased its first copies of VideoFROG in June 2002.  *Id.*  Not

9  long after VideoFROG shipped, Trebino began to contact DeLong to repeatedly request that he

10  adapt Femtosoft FROG to work with GRENOUILLE, complaining that VideoFROG was bug-

11  ridden, that Kane was erratic and often refused to support end customers, that VideoFROG failed to

12  display FROG error values, and that Swamp Optics' European distributor had refused to sell

13  GRENOUILLE until VideoFROG was fixed.  *Id.* ¶ 55.

14      In 2003, DeLong began to adapt Femtosoft FROG to work with GRENOUILLE at Trebino's

15  request.  *Id.* ¶ 56.  That version of Femtosoft FROG became known as QuickFrog.  *Id.*  In or about

16  the third quarter of 2003, Trebino informed Kane about DeLong's development of QuickFrog.  *Id.*

17  DeLong, Trebino, and Kane discussed feature sets and assisted in identifying bugs in their respective

18  software, including three-way email discussions about these issues from the fourth quarter of 2003

19  until the second quarter of 2009 between Femtosoft, Swamp Optics, and Mesa, the company Kane

20  had founded.  *Id.*

21  C.   Patent

22      On March 17, 2004, Swamp Optics sold its first copy of QuickFrog.  *Id.* ¶ 57.[2]  One week

23  later, Kane filed U.S. Patent Application 10/808,010 ("the '052 patent application").  *Id.*  The

24  application claimed matter that was already present in QuickFrog.  On October 31, 2006, the '052

25

26  _____

27      [2] It is unclear from Defendants' counterclaims how Swamp Optics could both purchase and
   sell QuickFrog.  *See* Countercl. ¶¶ 57 (sell), 61 (purchas).  Presumably, Swamp Optics sold copies of

28  QuickFrog it purchased from Defendants to its GRENOUILLE customers, although the
   counterclaims do not specifically allege this fact.

patent issued. *Id.* ¶ 58. Two days later, Kane sent an email to DeLong, attaching a copy of the '052 patent and stating that it "appear[e]d to be relevant to [DeLong's] QuickFROG product." *Id.*

On January 7, 2007, Kane and DeLong talked to each other by phone, at which time Kane told DeLong not to worry about the '052 patent and that it was just a formality. *Id.* ¶ 59. Because Kane told DeLong not to worry about the '052 patent, Defendants did not take any action against Plaintiffs, even though the '052 patent asserted as inventive matter things that were already well-known in the public art, including work previously done by DeLong, at least some of which went into QuickFrog. *Id.*

D.  <u>Business Development</u>

Between 2004 and 2008, unit sales of VideoFROG vastly outpaced those of QuickFrog, during which time QuickFrog obtained no more than a ten to twenty-five percent share of the market. *Id.* ¶ 60. However, in late February 2009, Kane advised Trebino that he would no longer support GRENOUILLE and was refocusing his efforts on a smaller segment of the market and on his own product line, which included Mesa's own hardware as well as VideoFROG. *Id.* ¶ 61. Kane recommended that Trebino and Swamp Optics purchase QuickFrog instead of VideoFROG. *Id.* In fact, Kane entered an oral agreement with Trebino and Swamp Optics that Trebino and Swamp Optics switch from purchasing VideoFROG to QuickFrog, which agreement Plaintiffs offered in order to avoid claims by Trebino and Swamp Optics for problems with Plaintiffs' products and lack of support. *Id.* Kane also recommended to potential customers of Swamp Optics' equipment that they purchase QuickFrog instead of VideoFROG, even offering refunds to buy QuickFrog for Swamp Optics customers to replace VideoFROG. *Id.*

Until the complaint in this action was filed in October 2012, Plaintiffs never asserted to Defendants that QuickFrog infringed the '052 patent, did not ask DeLong to stop selling QuickFrog, did not offer to discuss licensing the patent, and made no demands whatsoever on DeLong or Femtosoft. *Id.* ¶ 62. Between January 2007 and the filing of the complaint in this action, Plaintiffs never sought to discuss the '052 patent with Defendants. *Id.*

**United States District Court**

For the Northern District of California

E.      Procedural History

Plaintiffs Kane and Mesa filed their complaint in this matter on October 22, 2012 asserting a sole claim for infringement of the '052 patent.  Compl. ¶¶ 20-30.  Defendants DeLong and Femtosoft filed the amended counterclaims that are the subject of this motion to dismiss on January 9, 2013.  *See* Docket Nos. 20, 23.  While Defendants' counterclaims are for invalidity, non-infringement, inequitable conduct, equitable estoppel, laches, breach of contract, and violation of section 17200, Plaintiffs only move to dismiss Defendants' counterclaims for equitable estoppel, laches, breach of contract, and violation of section 17200.  *See* Docket Nos. 20, 23.  In addition, Plaintiffs move to strike Defendants' reservation of affirmative defenses and their prayer for relief as it relates to claims for equitable estoppel, laches, breach of contract, and section 17200.  Pls.' Mot. 10.

## III.      DISCUSSION

A.      Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a counterclaim based on the failure to state a claim upon which relief may be granted.  A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when the plaintiff [or counterclaimant] pleads factual content that allows the court to draw the reasonable inference that the defendant [or counterdefendant] is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a [counter]defendant acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**United States District Court**
For the Northern District of California

B.     Equitable Estoppel

Defendants' equitable estoppel counterclaim asserts that Plaintiffs' conduct misled Defendants to conclude that Plaintiffs did not intend to enforce the '052 patent, and thus Plaintiffs are estopped from asserting infringement.  Countercl. ¶ 84.

1.     Statement of Law

In an assertion of equitable estoppel against a patent infringement claim, three elements must be established:

> a. The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.
>
> b. The alleged infringer relies on that conduct.
>
> c. Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).[3]

Here, Plaintiffs do not assert that Defendants do not meet the first or third prongs of this three-part test, but rather contest only the second prong.  *See* Pls.' Mot. 2-4.  To meet the second prong, "[t]he accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action." *Id.* at 1042-43.  "'To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with [its investments].'" *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995) (quoting *A.C. Aukerman*, 960 F.2d at 1043).

_____

[3] *A.C. Aukerman* also summarizes the factors as

> [1] The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. [2] The other relies upon that communication. [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

960 F.2d at 1041 (quoting D.B. Dobbs, *Handbook on the Law of Remedies* § 2.3 at 42 (1973)).

6

2.   <u>Analysis</u>

Defendants assert four instances of misleading conduct:

>   (a) the fact that [Plaintiffs] declined to discuss the '052 patent with [Defendants] after initially purportedly notifying [Defendants] of its issuance, including but not limited to active participation in ongoing e-mail discussions amount Trebino and Swamp Optics, [Defendants] and [Plaintiffs] that disclosed [Defendants'] ongoing licensing and development of [Defendants'] products including QuickFrog from 2003 to 2009;
>
>   (b) [Plaintiffs'] statements to [Defendants] not to worry about the patent;
>
>   (c) [Plaintiffs'] recommendation to others to use the accused [Defendants'] products; and
>
>   (d) [Plaintiffs'] offer to buy QuickFrog licenses for end users of their own VideoFROG product, to allow them to switch from VideoFROG to QuickFrog.

Countercl. ¶ 84 (paragraph spacing added).

Defendants allege that they relied on this conduct by "licensing the accused products to customers they would not have licensed the products to but for [Plaintiffs'] actions," including "licensing to Trebino and Swamp Optics as well as . . . former customers of [Plaintiffs], including but not limited to those specifically recommended to buy from [Defendants] by [Plaintiffs]." Countercl. ¶ 85.  In addition, Defendants allege that "[Plaintiffs'] assurances that [Defendants] need not worry about the '052 patent lulled [Defendants] into inaction for [Plaintiffs'] claiming as patentable matter [w]hat had been created by [Defendants]" and "forewent legal action during the period of time within the statute of limitations for claims they could have pursued against [Plaintiffs]." *Id.*

Plaintiffs disregard Defendants alleged reliance on alleged instances of misconduct (a), (c), and (d), and baldly assert that Defendants only allege reliance based on (b).  *See* Pls.' Mot. 3.  This assertion does not have any grounding in the text of the counterclaim, which specifically states that Defendants relied on Plaintiffs' conduct in licensing the accused products to various customers, presumably referring to all four instances of conduct.  *See* Countercl. ¶ 85.

Even if Defendants had only alleged reliance based on misconduct (b), they have still alleged sufficient facts to survive Plaintiffs' motion to dismiss.  Plaintiffs assert that, because Defendants

United States District Court

For the Northern District of California

1    were already licensing and developing QuickFrog from 2003 to 2009, they could not have

2    detrimentally relied on the January 7, 2007 conversation in which Kane told DeLong not to worry

3    about the patent.  Pls.' Mot. 3.  However, viewing the facts alleged in the light most favorable to

4    Defendants, it is clear that Defendants *increased* their licensing of QuickFrog following this

5    conversation.  Defendants allege that between 2004 and 2008, they only obtained between a ten and

6    twenty-five percent share of the market.  Countercl. ¶ 60.  Once Plaintiffs largely withdrew from the

7    market and referred a number of their customers to Defendants, Defendants' market share grew.  *See*

8    *id.* ¶ 61.  Defendants specifically allege that they "licens[ed] the accused products to customers they

9    would not have licensed the products to but for [Plaintiffs'] actions," including "the amount of

10   licensing to Trebino and Swamp Optics as well as to former customers of [Plaintiffs]," and that they

11   "sold more QuickFrog products to a wider market due to the inexcusable delay of [Plaintiffs']

12   bringing suit than they would have if [Plaintiffs] had timely brought suit."  Countercl. ¶¶ 85, 93.

13          Several cases cited by Defendants have found reliance based on comparable fact patterns.

14   For example, in *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1311-12 (Fed. Cir.

15   2010), the Federal Circuit found reliance where a party "expanded" its sale of the accused products

16   following a cease-and-desist letter that was not followed up with a patent infringement lawsuit until

17   nearly four years later.  In *Scholle Corp. v. Blackhawk Molding Co., Inc.*, 133 F.3d 1469, 1470-71,

18   1473 (Fed. Cir. 1998), the Federal Circuit found reliance where the accused infringer greatly

19   increased its sales of the accused product following a meeting in which the patentee indicated it

20   considered the accused product to be outside the scope of the patent.

21          This case resembles each of the above-cited cases.  As alleged, Defendants barreled forward

22   in *expanding* their sales of QuickFrog in reliance on Plaintiffs' conduct, meanwhile accumulating

23   years of potential liability while foregoing opportunities to achieve an early resolution of this suit.

24   *See* Countercl. ¶¶ 85, 93.

25          Reliance can also occur when the accused infringer foregoes certain legal remedies.  In

26   *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 124 (D. Mass. 1993), the court found reliance

27   where the accused infringer "dismantled its legal efforts concerning the . . . patent [at issue]" and

28   "did not try to mitigate possible damages by effecting a quick settlement or initiating a declaratory

United States District Court

For the Northern District of California

1  judgment action."  In this case, Defendants allege that they were "lulled into inaction," including not

2  claiming as patentable matter the aspects of the '052 patent that they had created, and that they

3  "forewent legal action during the period of time within the statute of limitations for claims they

4  could have pursued against [Plaintiffs]."  Countercl. ¶ 85.  Although in their counterclaims

5  Defendants do not specifically allege what legal action they could have taken, presumably they

6  could have brought an earlier interference proceeding with the PTO, as discussed below.

7         Defendants have sufficiently pled reliance, and the Court therefore **DENIES** Plaintiffs'

8  motion to dismiss Defendants' counterclaim for equitable estoppel.

9  C.    Laches

10        Similarly, Defendants' counterclaim for laches asserts that, because Plaintiffs waited for

11  nearly six years after the '052 patent issued before bringing their claim for infringement, their

12  infringement claim should be barred.  Countercl. ¶¶ 90-91.  In the patent context, a claim for laches

13  requires that "(a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the

14  alleged infringer suffered material prejudice attributable to the delay."  *A.C. Aukerman*, 960 F.2d at

15  1028.  Plaintiffs only challenge Defendants' laches counterclaim on the grounds that Defendants

16  have failed to show prejudice.  *See* Pls.' Mot. 4-5.

17        In a laches claim, "prejudice may be either economic or evidentiary."  *A.C. Aukerman*, 960

18  F.2d at 1033.  "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to

19  present a full and fair defense on the merits due to the loss of records, the death of a witness, or the

20  unreliability of memories of long past events, thereby undermining the court's ability to judge the

21  facts."  *Id.*  "Economic prejudice may arise where a defendant and possibly others will suffer the

22  loss of monetary investments or incur damages which likely would have been prevented by earlier

23  suit."  *Id.*  Notably, economic damages must normally be something more than just those attributable

24  to a finding of liability for infringement.  *Id.*  "On the other hand, this does not mean that a patentee

25  may intentionally lie silently in wait watching damages escalate, particularly where an infringer, if

26  he had had notice, could have switched to a noninfringing product."  *Id.* (citation omitted).

27  "[I]ncreasing sales without additional evidence of capital investments may constitute economic

28  prejudice" where increased expenditures, i.e., on marketing and development, are related to actions

taken by the patentee. *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995). "A nexus must be shown between the patentee's delay in filing suit and the expenditures; the alleged infringer must change his position because of and as a result of the delay." *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 356 F.3d 1057, 1066 (Fed. Cir. 2003) (quotation marks and citation omitted).

In their laches claim, Defendants allege two forms of prejudice, that they "sold more QuickFrog products to a wider market due to the inexcusable delay of [Plaintiffs'] bringing suit than they would have if [Plaintiffs] had timely brought suit" (thus subjecting them to exposure to greater damages) and that they "forewent legal action during the period of time within the statute of limitations for claims they could have pursued against [Plaintiffs]." Countercl. ¶ 93. Neither of these allegations constitute the sort of evidentiary prejudice contemplated by *A.C. Aukerman*. *See* 960 F.2d at 1033. Thus, the Court must consider each as forms of economic prejudice.

Several cases help illustrate whether these allegations suffice to show economic prejudice. In *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1463 (Fed. Cir. 1990), *overruled on other grounds by A.C. Aukerman*, 960 F.2d at 1038, the Federal Circuit found no prejudice where an accused infringer had already invested in producing and selling the accused product prior to the laches period beginning to run, and thus would have spent such money anyway. In *State Contracting & Engineering Corp.*, 346 F.3d at 1066-67, the Federal Circuit found no prejudice where the accused infringer continued to incorporate the patented invention into its products, but allegedly would not have done so had suit been filed in a timely manner. Specifically, the court noted that this alleged prejudice was indistinguishable from the amount of the accused infringer's infringement liability, and thus not sufficient to support a laches defense. *Id.* at 1066. Moreover, the accused infringer did not demonstrate a nexus between the delay in filing suit and the asserted economic injury, as it did not allege that an earlier filing would have led it to alter its behavior or avoid incurring certain defenses. *Id.* at 1066-67.

By way of contrast, in *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995), the Federal Circuit found economic prejudice where the delayed suit would result in damages which likely would have been prevented by an earlier suit, such as expenditures on

United States District Court

For the Northern District of California

1  procuring patents and development of related technology, threefold expansion of the alleged

2  infringing activity, and failure to take a license under the relevant patent.  In *Mahmood v. Research*

3  *in Motion Ltd.*, No. C-11-5345 KBF, 2012 WL 1801693, at *7 (S.D.N.Y. May 16, 2012), the court

4  found the defendant did demonstrate economic prejudice where it produced testimony that, if it had

5  sufficient information about the plaintiff's claims, it could have pursued a licensing arrangement,

6  changed its patent prosecution and enforcement strategy, and designed around the plaintiff's alleged

7  contribution to its product.  The defendant produced evidence that it had taken such actions in the

8  past when presented with potential patent violations.  *Id.*

9       Here, Defendants' allegations more closely resemble those in *ABB Robotics* and *Mahmood*

10  than those in *Meyers* and *State Contracting*.  While Defendants were already selling QuickFrog prior

11  to Plaintiffs' obtaining the '052 patent, Defendants, like the defendant in *ABB Robotics*, "sold more

12  QuickFrog products to a wider market" due to Plaintiffs' silence.  Countercl. ¶¶ 85, 93.  Thus, it may

13  reasonably be inferred from the counterclaim that sales *increased* (rather than simply remaining

14  static) as a result of Plaintiffs' conduct.

15       Moreover, similar to the *Mahmood* defendant that changed its patent prosecution and

16  enforcement strategy as a result of the plaintiff's delay, Defendants here "forewent legal action

17  during the period of time within the statute of limitations for claims they could have pursued against

18  [Plaintiffs]."  Countercl. ¶ 93.  Although not cited by Defendants, a review of the law circa 2006 to

19  2007 reveals that Defendants had "one year from the date on which the ['052] patent was granted" to

20  initiate an interference proceeding claiming "the same or substantially the same subject matter" as

21  the '052 patent.  *See* 35 U.S.C. § 135 (2006).[4]

22       Even if there were no limitation ban on challenging the '052 patent before the PTO (*e.g.*, via

23  a reexamination proceeding) or this Court, Defendants could have brought such a challenge earlier

24  to obtain a ruling before incurring enhanced liability.

25

26

27        [4] On March 16, 2013, new derivation proceedings replaced the interference proceedings that

28  were in effect as of 2006 and 2007.  *See* Leahy-Smith America Invents Act, Pub. L. No. 112-29, §§ 3(i), (n), 125 Stat. 284, 290, 293 (2011).

Here, the '052 patent was issued on October 31, 2006, Kane notified DeLong of the '052 patent on November 2, 2006, and Kane told DeLong not to worry about the '052 patent on January 7, 2007.  Countercl. ¶¶ 58-59.  Defendants forewent their opportunity to pursue an interference action by October 31, 2007 due to Plaintiffs' inaction and "assurances that [Defendants] need not worry about the '052 patent . . . ."  *Id.* ¶ 93.

For purposes of a motion to dismiss, Defendants' foregoing their opportunity to pursue an interference proceeding, coupled with their increased sales of QuickFrog and concomitant increased infringement liability, suffice to show economic prejudice.  Thus, the Court **DENIES** Plaintiffs' motion to dismiss Defendants' counterclaim for laches.

D.     Breach of Contract

Defendants' breach of contract counterclaim asserts breach of two separate alleged contracts: (1) the oral contract between Plaintiffs and Trebino for Trebino to buy QuickFrog from Defendants (accompanied by Plaintiff's withdrawal from that market), a contract of which Defendants are third party beneficiaries; and (2) the conversation between Kane and DeLong in which Kane told DeLong not to worry about the '052 patent.  Countercl. ¶¶ 97, 100.

1.     Choice of Law

Both parties cite California law in their discussion of Defendants' breach of contract counterclaim.  *See* Pls.' Mot. 5-6; Defs.' Opp'n 10-13.  However, it is unclear that California law actually governs.  California Civil Code section 1646 provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  Here, neither alleged contract indicates a place of performance.  Moreover, the counterclaim does not allege facts from which the place where each contract was made can be inferred.  It alleges that Defendants are located in California and Plaintiffs are located in New Mexico.  Countercl. ¶¶ 43-46.  It does not contain any allegations regarding the current location of Trebino or Swamp Optics, although Plaintiffs argue that Swamp Optics is located in Georgia.  *See* Pls.' Mot. 6.

Assuming that all the parties were located in these states at the time of each alleged contractual formation and the contracts did not indicate a place of performance, the alleged contract

United States District Court

For the Northern District of California

1   between Swamp Optics and Plaintiffs could conceivably be governed by Georgia or New Mexico

2   law, while the alleged contract between Plaintiffs and Defendants could possibly be governed by

3   California or New Mexico law.  *See* Cal. Civ. Code § 1646.  Where two states' laws could arguably

4   apply to a contract that does not contain a choice of law provision, California courts follow a

5   "governmental interests" approach to choice of law, whereby they apply a three-step examination.

6   *Wash. Mutual Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 919 (2001).  "Under the first step of the

7   governmental interest approach, the foreign law proponent must identify the applicable rule of law

8   in each potentially concerned state and must show it materially differs from the law of California."

9   *Id.*  "If . . . the trial court finds the laws are materially different, it must proceed to the second step

10  and determine what interest, if any, each state has in having its own law applied to the case." *Id.* at

11  920.  "Only if the trial court determines that the laws are materially different *and* that each state has

12  an interest in having its own law applied, thus reflecting an actual conflict, must the court take the

13  final step and select the law of the state whose interests would be 'more impaired' if its law were not

14  applied."  *Id.*

15       Here, Defendants only cite California law.  *See* Defs.' Opp'n 10-13.  While Plaintiffs

16  generally aver to the fact that several states' laws could apply and that third-party beneficiary

17  standing varies between different states' laws, they do not propose that the Court apply any foreign

18  law.  *See* Pls.' Mot. 5-6; Pls.' Reply 3-4.  Even if they did, they have not met their burden of

19  identifying the applicable rule of law in each potentially concerned state and showing it materially

20  differs from California law.  *See id.*; *Garamendi v. Mission Ins. Co.*, 131 Cal. App. 4th 30, 41 (2005)

21  (if party wishes for court to use another forum's laws, it must invoke the law of the foreign

22  jurisdiction, show that it materially differs from California law, and demonstrate how applying that

23  law will further the interest of the foreign jurisdiction, otherwise a California court will apply its

24  own law).  Thus, the Court applies California law to the alleged contracts.

25       2.    Third Party Beneficiary Contract

26       Plaintiffs argue that Defendants' allegations regarding the contract between Trebino and

27  Plaintiffs fail due to the statute of frauds.  *See* Pls.' Mot. 5-6; Pls.' Reply 3-5.  Defendants do not

28

13

contest that this contract falls within the statute of frauds, but rather contend that equitable estoppel and their own partial performance bar Plaintiffs' statute of frauds argument. Defs.' Opp'n 11-12.

                a.    <u>Equitable Estoppel</u>

The statute of frauds provides that contracts that are not to be performed within a year of their making must be in writing. *See* Cal. Civ. Code § 1624(a)(1). "[E]quitable estoppel may apply to avoid the statutes of fraud and to make an oral agreement enforceable if (a) the promisee *detrimentally relied* on the agreement and would suffer an *unconscionable injury* if the oral agreement were not enforced *or* (b) the promisor would receive *unjust enrichment* if allowed to retain the benefit of the promisee's performance without abiding by the promisor's obligations under the oral agreement." *Estate of Housley*, 56 Cal. App. 4th 342, 359 (1997) (emphasis in original).

Regarding the sort of "unconscionable injury" necessary under the first prong of this test, "loss of bargain, and damage resulting therefrom, do not themselves estop a [promisor] from relying upon the statute of frauds." *Carlson v. Richardson*, 267 Cal. App. 2d 204, 208 (1968). For example, in *Carlson*, the party seeking to enforce an oral contract to sell a tract of land had foregone opportunities to purchase other land and had purchased a tract of land adjacent to the disputed tract. *Id.* at 206. The court determined that, while foregoing opportunities to purchase other land did not suffice to show prejudice, the purchase of the adjacent tract of land sufficed, as it "may have amounted to a serious change in position made in reliance on the contract." *Id.* at 208.

As alleged, Defendants have lost more than just the bargain of the agreement between Plaintiffs and Trebino. Functionally, Defendants' argument appears to be that the alleged contract between Plaintiffs and Trebino served to create an implied license for Defendants to sell products potentially infringing on the '052 patent to Trebino. Applying the statute of frauds to that agreement subjects Defendants to damages above and beyond simply the benefit of the bargain between Plaintiffs and Trebino. For example, Defendants could be held liable for treble damages and attorney fees if their sale of QuickFrog to Trebino (even though allegedly contemplated by the contract) were held to be a willful infringement of the '052 patent. *See* 35 U.S.C. §§ 284-85; *Del Mar Avionics, Inc. v. Quintron Instrument Co.*, 836 F.2d 1320, 1328-29 (Fed. Cir. 1987). Such a result could plausibly constitute unconscionable injury. Thus, viewing the facts alleged in the light

United States District Court

For the Northern District of California

1    most favorable to Defendants, they have alleged sufficient facts to invoke equitable estoppel to

2    Plaintiffs' statute of frauds defense based on unconscionable injury.

3           Defendants' argument that Plaintiffs would be unjustly enriched if the statute of frauds were

4    to bar enforcement of their agreement with Trebino, while more speculative, also suffices.  In

5    essence, Plaintiffs, by entering into the alleged contract with Trebino for Trebino to buy QuickFrog

6    and by bringing this action, effectively seek to recoup Defendants' profits therefrom while avoiding

7    the legal risks Plaintiffs would have faced had they simply withdrawn from serving Trebino and

8    Swamp Optics without finding a substitute.  For purposes of a motion to dismiss, Defendants'

9    allegations of unjust enrichment suffice to bar Plaintiffs' statute of frauds defense.

10                        b.     Part Performance

11          As equitable estoppel applies, the Court need not reach the additional argument of part

12   performance.

13                        c.     Summary

14          As equitable estoppel bars assertion of the statute of frauds, the Court **DENIES** Plaintiffs'

15   motion to dismiss Defendants' breach of contract counterclaim to the extent it derives from the

16   alleged contract between Trebino and Plaintiffs for Trebino to purchase QuickFrog.

17          3.     Conversation Not to Worry About Patent

18          Next, Defendants assert that the phone conversation between Kane and DeLong in which

19   Kane instructed DeLong not to worry about the '052 patent served to create a contract.  *See* Def.'s

20   Opp'n 12:9-17; Countercl. ¶ 100.  Plaintiffs fail to address this theory behind Defendants' breach of

21   contract claim.  *See* Pls.' Mot. 3-5; Pls.' Reply 5-6.  Regardless, Defendants do not allege facts to

22   suggest that this conversation did, in fact, create a contract.  In order for a contract to exist, there

23   must be "sufficient cause or consideration."  *See* Cal. Civ. Code § 1550(4).  Consideration is defined

24   as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to

25   which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by

26   such person, other than such as he is at the time of consent lawfully bound to suffer, as an

27   inducement to the promisor . . . ."  Cal. Civ. Code § 1605.

28

**United States District Court**
For the Northern District of California

1    The closest allegation Defendants make to consideration is that they "did not take action

2   against Kane regarding [Plaintiffs'] use of matter not disclosed to the patent office and including

3   work that [Defendants] had already done and that was known to [Plaintiffs] to have been done by

4   [Defendants]." Countercl. ¶ 100. However, they do not allege that their refraining from taking such

5   action was offered "as an inducement to [Plaintiffs]," as required to constitute consideration. Cal.

6   Civ. Code § 1605. They do not allege that their refraining from taking action was part of any

7   agreement with Plaintiffs. Rather, they simply did not take action. Defendants do not even

8   generally aver to the existence of consideration, as they do with the other contract alleged in their

9   breach of contract counterclaim. *See* Countercl. ¶¶ 98, 100. Without consideration, Defendants

10  cannot maintain a breach of contract counterclaim on the basis of Plaintiffs' telling them not to

11  worry about the '052 patent. The Court thus **GRANTS** Plaintiffs' motion to dismiss the breach of

12  contract counterclaim to the extent it derives from this alleged contract.

13  E.    Section 17200

14    Defendants bring their UCL claim under the "unfair" prong of section 17200, which allows

15  for claims against "unlawful," "unfair," and "fraudulent" business practices. *See* Countercl. ¶¶ 101-

16  05; Cal. Bus. & Prof. Code § 17200. While the Court finds that Defendants may state a claim under

17  the UCL, that claim is dependent on Plaintiffs' bringing their infringement action, which conduct is

18  protected by the litigation privilege. Thus, the Court need not reach other arguments raised by

19  Plaintiffs.

20        1.    UCL Claim

21    Under the UCL, "unfair" conduct is that which either (1) "threatens an incipient violation of

22  an antitrust law"; (2) "violates the policy or spirit of one of those laws because its effects are

23  comparable to or the same as a violation of the law"; or (3) "otherwise significantly threatens or

24  harms competition." *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187

25  (1999). Rule 9(b)'s heightened pleading standard applies to UCL claims only to the extent they are

26  grounded in fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125-27 (9th Cir. 2009); *Swift v.*

27  *Zynga Game Network, Inc.*, No. C-09-5443 SBA, 2010 WL 4569889, at *7 (N.D. Cal. Nov. 3,

28  2010). Here, Defendants do not allege that Plaintiffs' actions were taken with an intent to deceive,

United States District Court

For the Northern District of California

1  as required for an action for fraud, and thus Rule 9(b)'s heightened pleading standard does not

2  apply. *See Gruen v. EdFund*, No. C-09-0644 JSW, 2009 WL 2136785, at *5 (N.D. Cal. July 15,

3  2009); *WebZero, LLC v. ClicVU, Inc.*, No. C-08-0504 MRP, 2008 WL 1734702, at *9 (C.D. Cal.

4  Apr. 4, 2008); Countercl. ¶¶ 101-05.

5       Defendants identify essentially three actions on Plaintiffs' part that underlie their UCL claim:

6  (1) Plaintiffs' direct or indirect encouragement of others to purchase QuickFrog, which purchases

7  are now the basis for their infringement claim; (2) Plaintiffs' indication to Defendants not to worry

8  about the '052 patent and subsequent silence; and (3) Plaintiffs' bringing an infringement lawsuit

9  following items (1) and (2). *See* Defs.' Opp'n 13-14; Countercl. ¶ 102. Given the UCL's broad

10 scope, such conduct arguably "threaten[ed] or harm[ed] competition," as it served to ratchet up

11 Defendants' legal exposure over the course of nearly six years and would potentially allow Plaintiffs

12 to recoup the gains of Defendants' labor through the current infringement claim. *See Cel-Tech*, 20

13 Cal. 4th at 187. Even if a UCL claim were stated, however, it is barred by California's litigation

14 privilege.

15       2.    Privileged Conduct in Bringing Lawsuit

16       California's litigation privilege, derived from California Civil Code section 47(b), applies to

17 "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other

18 participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some

19 connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). The

20 litigation privilege is an "absolute" privilege, such that "the only tort claim . . . falling outside the

21 privilege established by section 47(b) is malicious prosecution." *Hagberg v. Cal. Fed. Bank FSB*,

22 32 Cal. 4th 350, 360-61 (2004). "[N]o communication . . . is more clearly protected by the litigation

23 privilege than the filing of a legal action." *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41

24 Cal. 4th 1232, 1249 (2007). The purposes of the litigation privilege "are to afford litigants and

25 witnesses free access to the courts without fear of being harassed subsequently by derivative tort

26 actions, to encourage open channels of communication and zealous advocacy, to promote complete

27 and truthful testimony, to give finality to judgments, and to avoid unending litigation." *Rusheen v.*

28 *Cohen*, 37 Cal. 4th 1048, 1063 (2006).

United States District Court

For the Northern District of California

1    For example, in *Kashian v. Harriman*, 98 Cal. App. 4th 892, 917, 920 (2002), the court held

2    that the litigation privilege applies to UCL claims against an attorney accused of filing complaints

3    with sham plaintiffs and that "communications made in connection with litigation do not necessarily

4    fall outside the privilege simply because they are, or are alleged to be, fraudulent, perjurious,

5    unethical, or even illegal," even if the alleged "communications" are the pleadings themselves.[5]

6    However, *Kashian* fell within an exception to the litigation privilege, which permits UCL claims so

7    long as the party challenging the underlying litigation with a UCL claim is not a party to the

8    underlying litigation, and thus the court permitted the UCL claim to proceed.  *See id.* at 921-24 ("it

9    appears Kashian is simply a member of the public for purposes of the [UCL] cause of action, which

10   therefore is not foreclosed by the litigation privilege").

11       Here, the litigation privilege serves to prohibit UCL action to the extent it is based on

12   Plaintiffs' filing their infringement action, even if such an action is unethical or even illegal.  Unlike

13   in *Kashian*, Defendants here are parties to the alleged unfair litigation, and thus subject to the

14   litigation privilege.  Although Plaintiffs' first two actions -- encouragement of others to purchase

15   QuickFrog and indication to Defendants not to worry about the '052 patent -- do not fall within the

16   litigation privilege, Defendants' UCL claim is ultimately dependent on an infringement action

17   ultimately being filed.  Plaintiffs' first two actions, in and of themselves, caused no harm in the

18   absence of the infringement lawsuit.  Thus, the first two actions alone do not constitute an unfair

19   practice.  Rather, the crux of Defendants' UCL claim is that what makes these acts unfair and

20   injurious -- the ultimate act of filing the instant infringement action.  This step, essential to the UCL

21   claim, is privileged, and the UCL claim cannot survive without it.

22

23

24   ───────────────

25       [5] Federal *Noerr-Pennington* jurisprudence creates an exception to the First Amendment's
     protection of the right to petition where "persons use the governmental process -- as opposed to the
26   outcome of that process -- as an anticompetitive weapon."  *City of Columbia v. Omni Outdoor
     Advertising, Inc.*, 499 U.S. 365, 380 (1991).  Such a "'sham' situation involves a defendant whose
27   activities are not genuinely aimed at procuring favorable government action at all, not one who
     genuinely seeks to achieve his governmental result, but does so *through improper means*."  *Id.*
28   (quotation marks and citations omitted) (emphasis in original).  There is no comparable exception to
     California's litigation privilege.

Thus, Defendants' UCL claim is barred and the Court **GRANTS** Plaintiffs' motion to dismiss Defendants' UCL claim.[6]

F.    Motion to Strike

Plaintiffs move to strike Defendants' reservation of affirmative defenses in their first amended answer as well as various elements in their prayer for relief that relate to causes of action subject to Plaintiffs' current motion to dismiss. *See* Pls.' Mot. 10. Pursuant to Federal Rule of Civil Procedure 12(f), the Court may strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts have "considerable discretion in striking any redundant, immaterial, impertinent or scandalous matter." *Delta Consulting Group, Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

1.    Affirmative Defenses

In their first amended answer, Defendants include a paragraph stating that

> Defendants reserve all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses, at law or in equity, which may now exist or in the future may be available based on discovery and further factual investigation in this case.

Countercl. ¶ 42. Courts have both granted and denied similar motions to strike reservations of affirmative defenses. *Compare Sony/ATV Music Pub. LLC v. D.J. Miller Music Distributors, Inc.*, No. C-09-1098, 2011 WL 4729807, at *5 (M.D. Tenn. Oct. 7, 2011) (declining to strike because defendants retain the right to amend answer under Rule 15(a)), *with Kelley v. Thomas Solvent Co.*, 714 F. Supp. 1439, 1452 (W.D. Mich. 1989) (striking reservation of right to add other and further affirmative defenses because it serves no function in light of rules allowing for amendment of answer).

---

[6] Plaintiffs also invoke California's anti-SLAPP statute, California Code of Civil Procedure section 425.16 ("section 425.16"), with respect to the litigation privilege. *See* Pls.' Mot. 7-8. Section 425.16 provides for a "special motion to strike" a cause of action against a person arising from any act in furtherance of that person's right of petition or free speech in connection with a public issue. Here, Plaintiffs' section 425.16 argument is not properly before the Court, as Plaintiffs have not brought a special motion to strike, but are rather asserting section 425.16 as a defense in their motion to dismiss.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   The Court finds this paragraph reserving affirmative defenses is redundant of rights

2   Defendants already have under Rule 15(a).  It therefore **GRANTS** Plaintiffs' motion to strike this

3   paragraph.  Defendants may move to amend their answer to assert any additional affirmative

4   defenses should they arise.

5        2.     <u>Prayer for Relief</u>

6   Plaintiffs request that the Court strike the sections of Defendants' prayer for relief relating to

7   their counterclaims for equitable estoppel, laches, breach of contract, and unfair competition.  Pls.'

8   Mot. 10.  As the Court finds that Defendants have stated claims for equitable estoppel, laches, and

9   breach of contract, it **DENIES** Plaintiffs' motion to strike these sections of Defendants' prayer for

10  relief.  As the Court finds that Defendants' UCL claim is barred by the litigation privilege, it

11  **GRANTS** Plaintiffs' motion to strike this section of Defendants' prayer for relief.

12       **IV.**    <u>**CONCLUSION**</u>

13  In sum, the Court **DENIES** Plaintiffs' motion to dismiss Defendants' equitable estoppel and

14  laches counterclaims, as well as their breach of contract counterclaim to the extent it is based on the

15  alleged contract between Plaintiffs and Trebino for Trebino to purchase QuickFrog.  On the other

16  hand, the Court **GRANTS** Plaintiffs' motion to dismiss Defendants' breach of contract counterclaim

17  to the extent it is based on Kane's statement to Defendants that they need not to worry about the

18  '052 patent.  The Court dismisses this counterclaim without prejudice and with leave to amend.  The

19  UCL counterclaim is dismissed with prejudice because of the litigation privilege.

20  Defendants are advised that, in amending their complaint, they should not re-assert the claim

21  dismissed without prejudice unless they have a basis for doing so consistent with Federal Rule of

22  Civil Procedure 11.  In addition, Defendants may not add additional claims not addressed by this

23  Order without seeking prior leave of Court.  Defendants may amend their complaint within thirty

24  days of the date of this order if they so choose, otherwise the Court will dismiss the claim herein

25  with prejudice.

26  ///

27  ///

28  ///

United States District Court

For the Northern District of California

1    Lastly, the Court **GRANTS** Plaintiffs' motion to strike paragraph 42 of Defendants' answer

2 and the section of Defendants' prayer for relief based on Defendants' UCL counterclaim.  The Court

3 otherwise **DENIES** Plaintiffs' motion to strike.

4    This order disposes of Docket No. 23.

5

6    IT IS SO ORDERED.

7

8 Dated:  March 19, 2013

9

10                                                          _____
                                                           EDWARD M. CHEN
11                                                         United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28